TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN





ON MOTION FOR REHEARING







NO. 03-03-00631-CV






Texas Disposal Systems Landfill, Inc., Appellant


v.


Waste Management Holdings, Inc. (f/k/a Waste Management, Inc.)

and Waste Management of Texas, Inc., Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

NO. 97-12163, HONORABLE PAUL DAVIS, JUDGE PRESIDING





O P I N I O N


 We grant appellant's motion for rehearing, withdraw our opinion and judgment issued
June 23, 2005, and substitute the following in its place. 

 Appellant Texas Disposal Systems Landfill, Inc. challenges the take-nothing
judgment entered against it following a jury trial, contending that the trial court committed charge
error regarding issues of defamation per se and presumed damages; that the jury's zero-damages
award was against the great weight and preponderance of the evidence; and that the trial court erred
in dismissing certain claims on summary judgment, including Texas Disposal's causes of action for
defamation, tortious interference, and attempted monopoly/antitrust. Appellee Waste Management (1)
argues in a cross point that, as to the defamation claims, even if Texas Disposal's issues are sustained
on appeal, the take-nothing judgment should be affirmed based on the lack of evidence of actual
malice. We will affirm in part and reverse and remand in part.


BACKGROUND



 Texas Disposal owns and operates a landfill in southeast Travis County ("the Texas
Disposal landfill") as well as four other landfills in Travis, Williamson, Comal, and Bexar counties. 
Waste Management is one of Texas Disposal's competitors in the waste removal and landfill
services industry serving the Austin and San Antonio markets. 

 In 1995, Texas Disposal and Waste Management competed against one another for
a contract to provide waste removal and landfill services to the City of San Antonio. By May 1995,
San Antonio and Texas Disposal had begun bona fide negotiations on a contract for Texas Disposal
to assume operations of the city's Starcrest Transfer Station, from which Texas Disposal would haul
San Antonio's waste to the Texas Disposal landfill, starting in February 1997. San Antonio's city
council passed an ordinance in December 1996 authorizing the city manager to negotiate and execute
a contract for Texas Disposal to privately operate the Starcrest Transfer Station in accordance with
the terms of the proposed agreement between Texas Disposal and San Antonio, which was attached
and incorporated into the ordinance. As of the end of January 1997, however, the parties had not yet
executed a final contract.

 In November 1996, the City of Austin issued a "request for proposal," seeking bids
from companies to provide waste removal and landfill services. Texas Disposal and Waste
Management both submitted bids and, as of February 1997, had been selected as the two companies
to proceed to Phase II of the bid process for providing the "landfill" and "materials recovery facility
and transfer station or landfill" services to the City of Austin. 

 On January 30, 1997, before either the San Antonio or the Austin contract was
finalized, Waste Management caused an "Action Alert" memo to be distributed to environmental
and community leaders in Austin, including several members of the Austin City Council. Waste
Management hired Don Martin, a consultant, to draft the memo. Martin gathered information from
several Waste Management officials, who then approved the memo for publication. (2) Martin sent the
memo to an Austin environmental advocate to be "broadcast over his fax network" to the designated
group. The topic of the Action Alert was San Antonio's proposal to contract with Texas Disposal
to assume operations of the Starcrest Transfer Station. The memo warned readers about the
increased traffic and environmental problems that would result, questioned the environmental
integrity of the Texas Disposal landfill, and urged recipients of the memo to contact public officials
in San Antonio and Austin, as well as the San Antonio Express News, to inform them of "your
concerns." 

 In October 1997, Texas Disposal filed suit against Waste Management, (3) alleging that
Waste Management had routinely attempted to disparage Texas Disposal's reputation in an effort
to eliminate competition. Based on such conduct, Texas Disposal claimed that Waste Management
was liable for defamation, tortious interference with an existing or prospective contract, and business
disparagement. The petition discussed the Action Alert memo as a specific example of improper
conduct by Waste Management, which, according to Texas Disposal, caused economic damages by
delaying the execution of the San Antonio and Austin waste disposal contracts. (4) In addition to
compensatory and punitive damages, Texas Disposal sought injunctive relief
against Waste Management. 

 After this initial suit was filed, Waste Management published a series of
communications that we will collectively refer to as the "1998 Communications." Waste
Management sent a memo to the San Antonio Public Works Department on March 10, 1998,
questioning the legality of Texas Disposal operating the Starcrest Transfer Station due to the 
restrictions in the facility's zoning ordinance and its previously issued permit. Additionally, in May
1998, Waste Management sent an unsigned memo to the San Antonio City Council and the Texas
Natural Resource Conservation Commission (TNRCC) urging that the proposed contract with Texas
Disposal would result in multiple permit violations. And, on July 14, 1998, Waste Management
issued a press release that claimed Texas Disposal had "inspired" a protest demonstration over
Austin's landfill and that urged reasons why Texas Disposal should not be selected in Austin's bid
process. Texas Disposal amended its petition on July 25, 2000, to include claims based on the
1998 Communications. 

 Waste Management denied each of the allegations and asserted, as affirmative
defenses, that (1) the alleged statements were true and, thus, not defamatory; (2) the statements were
privileged communications made by an interested party in petitioning the government about a matter
of public concern; and (3) portions of Texas Disposal's claims were time-barred by the statute of
limitations. Waste Management also specially excepted that Texas Disposal had failed to plead
sufficient facts to support each of its claims, primarily based on a lack of proof
concerning causation and damages.

 Waste Management moved for partial summary judgment in January 2001, seeking
dismissal of Texas Disposal's claims based on the 1998 Communications, which had been added to
the petition in 2000, because they were not pled within the applicable one- and two-year statutes of
limitations. (5) See Tex. Civ. Prac. & Rem. Code Ann. §§ 16.002-.003 (West 2002 & Supp. 2005)
(limitations periods for defamation, tortious interference, and business disparagement). Texas
Disposal responded that the 1998 Communications claims were not time-barred because they related
back to the original pleading, which broadly alleged that Waste Management had "routinely"
engaged in a pattern of improper conduct that was "ongoing and continuous." See id.
§ 16.068 (West 1997). 

 The trial court granted Waste Management's motion for partial summary judgment,
holding that Texas Disposal's claims based on the 1998 Communications were new and distinct
transactions that did not relate back and were, therefore, barred by the statute of limitations. See id.
§§ 16.002-.003, .068. Accordingly, on March 2, 2002, the court dismissed those
claims with prejudice. (6)

 Texas Disposal filed a third amended petition in May 2002, adding antitrust claims
against Waste Management for its "attempt to monopolize" in violation of Texas Business and
Commerce Code section 15.05(b). Texas Disposal claimed that, because Waste Management held
more than 45% of the San Antonio market and 38% of the Austin market, its efforts to eliminate
competition by disparaging Texas Disposal resulted in a "dangerous probability of achieving
monopoly power." See Tex. Bus. & Com. Code Ann. § 15.05(b) (West 2002). Texas Disposal
relied in part on the 1998 Communications as support for this claim, which was not limited by a two-year statute of limitations. See id. § 15.25 (West 2002).

 In turn, Waste Management sought another motion for partial summary judgment. 
See Tex. R. Civ. P. 166a(c), (i). For each of Texas Disposal's claims, Waste Management asserted
nearly twenty separate grounds for dismissal, including the statute of limitations, the protection
afforded to privileged communications in petitioning the government, and that assorted essential
elements of Texas Disposal's claims had been conclusively negated and/or lacked
any evidentiary support. 

 Texas Disposal then filed its own motion for partial summary judgment, asking the
court to hold as a matter of law that (1) the Action Alert memo was "published," (2) the memo was
defamatory and defamatory per se, (3) the statements within and impressions arising from the memo
were false, (4) Waste Management knew of this falsity at the time of publication, and (5) a contract
existed between Texas Disposal and the City of San Antonio upon which its claim for
tortious interference was based.

 On March 25, 2003, the trial court signed a "final, corrected order" of summary
judgment on both Waste Management's and Texas Disposal's motions; the court granted and denied
portions of each party's motion. In the order, the court specifically delineated the grounds for its
rulings. In relevant part to this appeal, the trial court's order concluded that: 


(1) Texas Disposal's claims based on the 1998 Communications for defamation,
tortious interference, and business disparagement were time-barred by the
statute of limitations; 


(2) the March and May 1998 memos were privileged by Waste Management's right
to petition the government/public interest privilege; 


(3) material fact issues remained about the essential elements of proximate cause
and damages on Texas Disposal's defamation claims;


(4) the Action Alert memo was "published" and contained certain statements that
were materially false and reasonably capable of defamatory meaning;
specifically, as a matter of law, the following statements in the Action Alert
were "defamatory":


(a) that the Texas Disposal facility "applied for and received an exception to
the EPA subtitle D environmental rules";


(b) that "Other landfills in Central Texas and San Antonio in similar clay
formations are using the full synthetic liner in addition to clay soils";


(c) the impression or implication that the Texas Disposal facility is
environmentally less protective than other area landfills, including Waste
Management's;


(d) the impression or implication that the Texas Disposal facility does not
have a leachate collection system (7);


(5) Texas Disposal is, as a matter of law, a limited purpose public figure that must
prove "actual malice" to prevail on its defamation claim, but a fact issue
remained on that element because Waste Management failed to conclusively
negate actual malice; 


(6) at the time of Waste Management's allegedly tortious interference with an
existing contract, no contract existed between Texas Disposal and San Antonio
for the operation of the Starcrest Transfer Station, and no claim was pled by
Texas Disposal about tortious interference with an Austin contract; thus, Texas
Disposal's claim for tortious interference with an existing contract was
dismissed for no evidence;


(7) Waste Management's alleged interference with a prospective contract between
Texas Disposal and San Antonio, and between Texas Disposal and Austin, did
not prevent the formation of these contracts; Waste Management's alleged
interference with a prospective contract did not proximately cause any damage
or loss to Texas Disposal; thus, these claims were dismissed for no evidence;


(8) although there was evidence of Waste Management's specific intent to
monopolize, its conduct allegedly performed in an attempt to monopolize did
not, as a matter of law, constitute predatory or anticompetitive conduct, and did
not create a dangerous probability of achieving monopoly power over the waste
management markets in San Antonio or Austin; thus, these claims were
dismissed for no evidence.



Thus, following the court's order, the only claim remaining for trial on the merits was defamation
related to the Action Alert memo, on which Texas Disposal was required to prove actual malice. (8)

 Texas Disposal specifically requested that the jury charge include questions,
definitions, and instructions regarding defamation per se and the related issue of presumed damages. (9) 
Waste Management objected to the inclusion of these issues in the charge. Ultimately, the jury
charge submitted by the court did not ask the jury whether the statements were defamatory per se nor
instruct the jury on presumed damages. Instead, the charge asked only whether the statements were
false; whether there was clear and convincing evidence that Waste Management knew of the falsity
or had serious doubts about the statements' truth (i.e., whether Waste Management had published
the statements with actual malice); whether Waste Management had acted with common law malice;
and what amount of damages, both actual and exemplary, should be awarded. 

 The jury found that the statements were false and that, by clear and convincing
evidence, Waste Management knew of the falsity or had serious doubts about their truth. Thus, the
jury entered an affirmative finding on actual malice. Nonetheless, the jury determined that Waste
Management's publication of the Action Alert caused zero actual damages to Texas Disposal. 
Further, the jury concluded that Waste Management had not acted with common law malice and,
therefore, awarded no exemplary damages. In accordance with this verdict, on August 5, 2003, the
court entered a final, take-nothing judgment against Texas Disposal. Following an unsuccessful
motion for new trial, Texas Disposal filed this appeal.


DISCUSSION



 Texas Disposal challenges the judgment in the following six issues: whether (1) the
trial court erred in refusing to question and instruct the jury regarding Texas Disposal's defamation
per se claim and presumed damages, (2) the jury's finding of zero damages is against the great
weight and preponderance of the evidence, (3) the court erred in dismissing the 1998
Communications claims on statute of limitations grounds, (4) the court erred in ruling that the March
and May 1998 memos were privileged communications, (5) the court erred in dismissing Texas
Disposal's claims for tortious interference with an existing and/or prospective contract, and (6) the
court erred in dismissing the attempted monopolization/antitrust claim. In a cross point, Waste
Management argues that the take-nothing judgment should be affirmed because there was not clear
and convincing evidence of actual malice. We will begin with Waste Management's cross point and
then address each of Texas Disposal's issues in turn. (10) 

Actual Malice


 Waste Management argues that, even if Texas Disposal's issues regarding its
defamation claims are sustained on appeal, the take-nothing judgment should be affirmed because
there is not legally sufficient evidence to uphold the jury's finding of actual malice.

 To prevail on a defamation claim, a plaintiff who is a limited purpose public figure,
such as Texas Disposal, (11) must prove by clear and convincing evidence that the defendant published
the allegedly defamatory statements with actual malice. Gertz v. Robert Welch, Inc., 418 U.S. 323,
342 (1974); WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 (Tex. 1998). Actual malice means
that the defendant published the statement either with "knowledge that it was false or with reckless
disregard of whether it was false or not." New York Times v. Sullivan, 376 U.S. 254, 279-80 (1964);
see also Turner v. KTRK-TV, Inc., 38 S.W.3d 103, 119-20 (Tex. 2000). Evidence is "clear and
convincing" if it supports a firm conviction on behalf of the trier of fact that the fact to be proved
is true. Bentley v. Bunton, 94 S.W.3d 561, 596-97 (Tex. 2002). 

 In reviewing a jury's determination on the issue of actual malice, the First
Amendment requires that we independently decide whether the evidence in the record is sufficient
to pass the constitutional threshold, which bars a public figure's recovery for defamation when the
element of actual malice is not supported by clear and convincing proof. Bose Corp. v. Consumers
Union, 46 U.S. 485, 510-11 (1984). Although questions regarding the sufficiency of the evidence
are traditionally questions of law, we do not treat this inquiry as a "pure question of law" because
it involves issues of credibility. Harte-Hanks Commc'ns, 491 U.S. 657, 685 (1989); Bentley, 94
S.W.3d at 597. "No constitutional imperative can enable appellate courts to do the impossible--
make crucial credibility determinations without the benefit of seeing the witnesses' demeanor. If
the First Amendment precluded consideration of credibility, the defendant would almost always be
a sure winner as long as he could bring himself to testify in his own favor." 
Bentley, 94 S.W.3d at 597. 

 Thus, in determining whether there was sufficient evidence to support the jury's
determination on actual malice, we give some amount of deference to the fact finders and review the
factual record in full. Id. at 598. The supreme court has set forth specific steps to be taken in
conducting such a review:


[A]n independent review of evidence of actual malice should begin with a
determination of what evidence the jury must have found incredible. . . . Next,
undisputed facts should be identified. . . . Finally, a determination must be made
whether the undisputed evidence along with any other evidence that the jury could
have believed provides clear and convincing proof of actual malice.



Id. at 599 (citing Harte-Hanks, 491 U.S. at 690-91). The Bentley court further explained that, even
if a defendant testifies in favor of itself, "[t]he fact finder may choose with reason to disregard the
defendant's testimony." Id. If the jury's decisions regarding credibility are reasonable, then the
appellate court must defer to the jury's determinations. Id. 

 Here, the jury answered "yes" when asked whether there was clear and convincing
evidence that Waste Management published the Action Alert memo with knowledge of its falsity
or with serious doubts about its truth. The jury was instructed that, for purposes of this question,
Waste Management "means only those persons, including Don Martin and Al Erwin, (12) in the WMT
organization who had responsibility for the publication of the Action Alert memo." (13) 

 The Action Alert memo reported that "[t]he San Antonio City Council is currently
considering a proposal to greatly increase the amount of their municipal waste they truck 70 miles
to Travis County . . . to the Texas Disposal System. . . . PLUS the proposal calls for privatizing San
Antonio's Starcrest Transfer Station with TDS taking over the operations." The memo then
discussed what types of waste Texas Disposal would be hauling: "TDS may bring municipal solid
waste, commercial waste, special waste, construction waste, roll-off containers, and sludge and
liquid waste. . . . There are no restrictions on the types of waste that may be disposed of at the TDS
landfill, with the exception of hazardous waste." Next, the memo contained a paragraph regarding
environmental concerns, which included warnings that the Texas Disposal contract would "result
in a large increase in heavy truck traffic along IH-35 . . . [and] a commensurate increase in the
amount of air traffic emissions . . . and the potential for accidents." The trial court ruled in its March
23, 2003 order that all of the above statements (except the statement that San Antonio's arrangement
with Texas Disposal was a "proposal") were false and reasonably capable of a defamatory meaning. (14)

 The portion of the memo causing Texas Disposal the greatest concern is subtitled
"Landfill Liner and Leachate Collection." The trial court specifically ruled in its March 2003 order
that the statements in and the implications created by this paragraph were defamatory. In full, this
paragraph stated:


Unlike other landfills in the Travis County area, TDS's landfill applied for and
received an exception to the EPA Subtitle D environmental rules that require a
continuous synthetic liner at the landfill and a leachate collection system utilizing a
leachate blanket to collect water that comes in contact with garbage (so that it cannot
build up water pressure in a landfill). TDS requested and received state approval to
use only existing clay soils as an approved "alternative liner" system, rather than use
an expensive synthetic liner over the clay. Other landfills in Central Texas and San
Antonio in similar clay formations are using a full synthetic liner in addition to the
clay soils.



Finally, the memo concluded with a call to action, encouraging readers to "contact the San Antonio
Mayor, City Council, and Public Works Director . . . [a]nd/or contact the San Antonio Express News
with your concerns. Also contact Travis County officials to let them know of your environmental
and traffic concerns."

 As instructed by Bentley, we begin our independent review by examining the
favorable evidence offered by Waste Management to determine what the jury must have found
incredible. See id. Martin, the author of the memo, testified that, at the time of publication, he did
not believe any of the statements to be false and did not entertain serious doubts about the truth, and
that he still believes the statements to be true. Martin further contended that he did not intend the
memo to convey that Texas Disposal's landfill was illegal, environmentally unsound, or lacking a
leachate collection system. Erwin, the Waste Management employee who provided Martin
information concerning the landfill's lining and leachate collection system, similarly testified that
he did not provide any information to Martin that he knew to be false or about which he seriously
doubted the truth. Erwin also testified that TNRCC staff people expressed concerns about the
integrity of Texas Disposal's landfill. 

 Based on the jury's affirmative answer to actual malice, the jury must have
disbelieved these self-serving statements. As long as that determination was reasonable, we too
should ignore this evidence. See id. (discussing Harte-Hanks, 491 U.S. at 690-91, in which Court
upheld jury's disregard of "defendant's self-serving assertions regarding its motives and its belief
in the truth of its statements"). In light of the undisputed evidence and the remainder of Martin's and
Erwin's testimony, we conclude that the jury had reason to disbelieve their denials. 

 A primary topic discussed in the testimony of both Martin and Erwin was the portion
of the Action Alert memo contrasting (1) Texas Disposal's use of an "alternative liner" system
through an "exception" to the EPA rules with (2) other landfills' usage of "a continuous synthetic
liner at the landfill and a leachate collection system utilizing a leachate blanket" as "required" by
Subtitle D of the rules. It is undisputed that this portion of the memo created a false and defamatory
impression that Texas Disposal's landfill is environmentally unsound and is less protective than
other landfills, including Waste Management's. (15) The falsity of these statements arises because, in
reality, there are two methods of complying with Subtitle D, the performance design method and the
synthetic liner system. The evidence in the record demonstrates that these two methods are
environmentally equal. It is further undisputed that Texas Disposal's landfill had been approved and
licensed by the TNRCC and that, because Texas Disposal's landfill was located in a "low
permeability" clay formation, it had some environmental advantages over other landfills. Moreover,
not all of the landfills operated by Waste Management have a full synthetic lining. Thus, contrary
to what was reported in the Action Alert, Texas Disposal's landfill is compliant with Subtitle D and
is not environmentally unsound or less protective than Waste Management's. 

 Martin acknowledged that he "had a . . . fairly good understanding of the overall
emphasis of Subtitle D" and that, through the course of his career, he "absolutely" had been able "to
discuss Subtitle D liner landfill issues with engineers." Martin also testified that, at the time he
wrote the memo, he understood that there were two ways to comply with Subtitle D (a performance
design or a composite liner) and that he understood that Texas Disposal's "alternative design" was
in compliance with Subtitle D. Martin also knew at the time he wrote the memo that Texas
Disposal's landfill had been licensed by the TNRCC and that it (according to his own testimony) was
located in one of the most "environmentally suitable locations" due to the "low permeability clay,"
which he considered to "off-set" the lack of a synthetic liner. Nonetheless, Martin said that he
"assumed" that Texas Disposal's landfill was environmentally unsound because he considered the
alternative design to be a "loophole around" the federal regulations.

 Martin also admitted that the intent of saying that Texas Disposal's landfill was an
"exception" to the EPA rules was "to convey the message that [Texas Disposal's landfill is] not [in]
compliance with Subtitle D." Martin testified that the statement was "intended to be a negative." 
He further agreed that the "statement was intended to be a negative comment for consumption by
the public generally" and that the "ultimate use of it would be to get back to the City of San Antonio
[officials] . . . negatively." He agreed that the ultimate intent of the Action Alert was to prevent San
Antonio from awarding its contract to Texas Disposal and that "the negative comment that [Texas
Disposal's landfill] was not in compliance with Subtitle D" was specifically used as a means to
achieve that purpose. When asked whether it was his "intention with the Action Alert to give the
reader the impression that the EPA Subtitle D environmental rules required a continuous synthetic
liner at the landfill and a leachate collection system that TDSL did not have," Martin responded,
"yes." Martin also testified that, at the time he authored the memo, people in Austin were upset with
San Antonio regarding water supply issues, and he agreed that he "saw the Action Alert memo as
an opportunity to try to tap into some of that outrage and resentment about San Antonio."

 This testimony presents evidence to support a finding of actual malice because it
demonstrates that, at the time Martin wrote the Action Alert memo, he knew (1) that Texas
Disposal's landfill was compliant with Subtitle D, (2) that the "performance design" and "synthetic
liner" systems were considered equally environmentally sound methods of complying with Subtitle
D, and (3) that the statements would create the negative impression that Texas Disposal's landfill
was less environmentally sound than Waste Management's and/or not in compliance with Subtitle
D. If a speaker has reason to "strongly suspect" that his representation of the facts is misleading,
then it is considered a "calculated falsehood" for purposes of actual malice. Turner, 38 S.W.3d at
120. Moreover, Martin testified that the purpose of the Action Alert was to hurt Texas Disposal in
the competition between it and Martin's client, Waste Management. Although "actual malice" is
not synonymous with ill will, spite, or evil motive, evidence that the defendant harbored ill will
towards the plaintiff is often probative on the issue of whether the defendant was reckless with the
truth in publishing the statements. See Bentley, 94 S.W.3d at 602; Casso v. Brand, 776 S.W.2d 551,
558 (Tex. 1989). Also, Martin's decision to leave out any mention of the Texas Disposal landfill's
advantageous location in "low permeability" clay indicates his intent to create a false impression that
the landfill was environmentally unsound. Huckabee v. Time Warner Entm't Co., 19 S.W.3d 413,
425-26 (Tex. 2000) (defendant's selective omission of facts to purposefully create false portrayal of
events was evidence of actual malice); see also Brown v. Petrolite Corp., 965 F.2d 38, 47 (5th Cir.
1992) (in case regarding defamatory statements made by company about its competitor, Fifth Circuit
upheld jury's finding of actual malice based on evidence that defendant "had the motive to publish
a false report and that it acted negligently in preparing the report. More importantly, evidence in the
record demonstrates that [defendant] was aware of information directly contradicting its findings but
failed to explain these contrary results.").

 Finally, Martin testified that he made no attempt to verify any of the information in
the Action Alert memo with any person outside of the Waste Management organization; he did not
verify his statements with anyone at the TNRCC or with any independent engineers or
environmentalists, and he did not seek a response from Texas Disposal. (16) Although the failure to
investigate does not, on its own, demonstrate actual malice, a purposeful avoidance of the truth does. 
See Harte-Hanks, 491 U.S. at 692 (ignoring two sources that could objectively verify allegations was
purposeful avoidance of discovering facts that might show allegations' falsity); Bentley, 94 S.W.3d
at 601 (actual malice existed where defendant "deliberately ignored" "all those who could have
shown [him] that his charges were wrong"). Here, Martin completely failed to talk to anyone outside
of Waste Management--a company that was paying Martin specifically to create a public perception
that its landfill services were superior to those of its competitor, Texas Disposal--when there were
people available in Austin who could have easily verified whether the information reported in the
memo was true or false. Under these circumstances, and in addition to the evidence discussed above,
we consider Martin's failure to independently verify any of the information to be indicative of actual
malice. See Bentley, 94 S.W.3d at 601.

 Erwin (the source of much of this information) similarly testified that he understood
Waste Management would benefit from the Action Alert memo because "the public would perceive
that one of them [Waste Management] was more environmentally responsible than the other [Texas
Disposal]." Erwin admitted, however, that when he told Martin that other area landfills were using
full synthetic liners, he knew that not all of Waste Management's landfills were fully lined. He also
acknowledged understanding at the time that "performance design" and "synthetic liner" are two
alternative methods for complying with Subtitle D, meaning that Texas Disposal's method was
equally compliant. For the same reasons we discussed concerning Martin's testimony, Erwin's
testimony provides evidence of actual malice. See Brown, 965 F.2d at 47; Bentley, 94 S.W.3d at
601-02; Huckabee, 19 S.W.3d at 425-26.

 Based on the above, there is clear and convincing evidence in the record that, when
Martin authored the Action Alert and when Erwin provided him information to include in the Action
Alert, they, at a minimum, had serious doubts about its accuracy. Thus, we overrule Waste
Management's cross point and affirm the jury's finding of actual malice. Consequently, we proceed
to Texas Disposal's first issue.


Charge Error


 In its first issue, Texas Disposal urges that the trial court's refusal to submit certain
questions and instructions in the jury charge related to defamation per se and presumed damages
constitutes reversible error. In determining whether the jury charge was in error, we review the trial
court's refusal to submit the particular items for an abuse of discretion. In re V.L.K., 24 S.W.3d 338,
341 (Tex. 2000). A trial court abuses its discretion by acting arbitrarily, unreasonably, or without
consideration of guiding principles. Walker v. Gutierrez, 111 S.W.3d 56, 62 (Tex. 2003). Although
the trial court has considerable discretion to determine which jury instructions are necessary and
proper, the court is required to submit questions, instructions, and definitions that are raised by the
written pleadings and supported by the evidence. Tex. R. Civ. P. 278; In re V.L.K., 24 S.W.3d at
341. A trial court may refuse to submit a question to the jury if (1) there is no evidence, (2) there
are no pleadings, or (3) the issue is uncontroverted. Island Recreational Dev. Corp. v. Republic of
Tex. Sav. Assoc., 710 S.W.2d 551, 555 (Tex. 1986). We will not reverse a judgment based on charge
error in the absence of harm, which results if the error "probably caused the rendition of an improper
judgment" or "probably prevented the petitioner from properly presenting the case to the appellate
courts." Tex. R. App. P. 44.1; see Harris County v. Smith, 96 S.W.3d 230, 234-35 (Tex. 2002);
Lone Star Gas Co. v. Lemond, 897 S.W.2d 755, 756 (Tex. 1995). 

 Here, Texas Disposal specifically complains that the trial court "erroneously refused
to query the jury as to whether the Action Alert was defamatory per se, or to correctly instruct the
jury that it could find presumed damages for a statement that is defamatory per se." We agree. (17)

 Under Texas law, a statement is defamatory if it tends to injure a person's reputation
and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach
any person's honesty, integrity, virtue, or reputation. See Tex. Civ. Prac. & Rem. Code Ann.
§ 73.001 (West 2005). There are two types of defamation: per quod and per se. Moore v. Waldrop,
166 S.W.3d 380, 384 (Tex. App.--Waco 2005, no pet.). Statements that are defamatory per quod
are actionable only upon allegation and proof of damages. Alaniz v. Hoyt, 105 S.W.3d 330, 345
(Tex. App.--Corpus Christi 2003, no pet.); see also Time, Inc. v. Firestone, 424 U.S. 448, 459
(1976) (evidence of injury is required to support award of compensatory damages in defamation
case). Thus, before a plaintiff can recover for defamation per quod, the plaintiff must carry his
burden of proof on both the existence of and amount of damages. See Leyendecker & Assoc., Inc.
v. Wechter, 683 S.W.2d 369, 374 (Tex. 1984); Peshak v. Greer, 13 S.W.3d 421, 427 (Tex.
App.--Corpus Christi 2000, no pet.).

 On the other hand, statements that are defamatory per se are actionable without proof
of injury. Bentley, 94 S.W.3d at 605; Knox v. Taylor, 992 S.W.2d 40, 50 (Tex. App.--Houston
[14th Dist.] 1999, no pet.) (statement is considered defamatory per se if words are so obviously
hurtful to plaintiff's reputation that they require no proof of their injurious character to make them
actionable). Thus, if the alleged statements have been classified as defamatory per se, general
damages are presumed without requiring specific evidence of harm to the plaintiff's reputation. Id.;
see also Snead v. Redland Aggregates Ltd., 998 F.2d 1325, 1331 (5th Cir. 1993) (explaining critical
distinction under Texas law between proof required to recover damages for defamation versus
defamation per se). A false statement will typically be classified as defamatory per se if it injures
a person in his office, profession, or occupation, id.; charges a person with the commission of a
crime, Leyendecker, 683 S.W.2d at 374; imputes sexual misconduct, Moore, 166 S.W.3d at 384; or
accuses one of having a loathsome disease, Bolling v. Baker, 671 S.W.2d 559, 570 (Tex. App.--San
Antonio 1984, no writ); see also Alaniz, 105 S.W.3d at 345. 

 The issue of whether statements are defamatory per se is generally a matter of law to
be decided by the court. West Tex. Utils. Co. v. Wills, 164 S.W.2d 405, 411 (Tex. Civ. App.--Austin
1942, no writ). The trial court should consider the statements and determine whether, even without
proof of harm, the statements were so obviously injurious to the plaintiff that, as a matter of law, the
plaintiff is entitled to recover damages. See Alaniz, 105 S.W.3d at 345. The court may, however,
pass the inquiry to the jury if it determines that an ambiguity exists about the meaning and effect of
the words or that a predicate fact question remains about whether the statements were published or
were false. Musser v. Smith Protective Serv., Inc., 723 S.W.2d 653, 655 (Tex. 1987); West Tex.
Utils., 164 S.W.2d at 411. 

 Here, through both a motion for summary judgment and a request for directed verdict,
Texas Disposal asked the court to rule as a matter of law that the statements in the Action Alert
memo were defamatory per se. The trial court denied both requests. By these rulings, however, the
trial court did not affirmatively rule that the statements were not defamatory per se. Rather, these
rulings demonstrate merely that, prior to the conclusion of the trial, the court was not convinced as
a matter of law that no ambiguities remained on the issue. See City of Keller v. Wilson, 168 S.W.3d
802, 823 (Tex. 2005) (summary judgment or directed verdict is only appropriate if evidence is so
clear that reasonable jurors could reach only one conclusion).

 The trial court entertained multiple pleadings from both parties in preparing the jury
charge. Through the course of these proceedings, Texas Disposal undeniably preserved the charge
error it complains of here by submitting in writing substantially correct questions and instructions
related to these issues, separately and specifically objecting in writing to the exclusion of these
requests in Waste Management's and the court's proposed charges, and obtaining rulings on its
requests and objections. See Tex. R. Civ. P. 272-274; First Valley Bank v. Martin, 144 S.W.3d 466,
474-76 (Wainwright, J., concurring) (discussing preservation of charge error under State Dep't of
Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 238-41 (Tex. 1992)). 

 Specifically, Texas Disposal proposed that the jury be asked whether "any of the
following statements, impressions, or implications from the Action Alert . . . are defamatory, and,
if defamatory, were they defamatory per se?" in connection with an instructions that a "statement
is defamatory per se if it tends to affect an entity injuriously in its business, occupation, or office, or
charges an entity with illegal or immoral conduct" and that, in makin its determination, the jury
should "consider a reasonable person's perception of the statement, impression, or implication in the
context of the Action Alert as a whole, and in light of the surrounding circumstances." Texas
Disposal further requested that the jury be instructed that answering "yes" to the defamatory per se
question means "damage to reputation is presumed and no proof of actual damage to reputation is
required. If you did not find a statement defamatory per se, there must be evidence of injury to
reputation for damage to be awarded for this element." 

 It was erroneous for the trial court to refuse to submit these questions and instructions
to the jury because they were raised by the written pleadings and supported by the
evidence--namely, evidence that Waste Management libeled Texas Disposal in a manner injurious
to its business. See Tex. R. Civ. P. 278; Knox, 992 S.W.2d at 50. Although defamation per se is
generally a legal question, in this case (as indicated by the court's previous rulings) there were
underlying ambiguities that could not be decided as a matter of law and needed to go to the jury. (18)

 This Court's prior opinion in West Texas Utilities Co., 164 S.W.2d 405, is instructive
on this issue. There, the defendant made a statement that was injurious to the plaintiff's occupation,
and the court refused to submit an issue to the jury regarding the statement's slanderous nature. Id.
at 408. The defendant argued that the issue of defamation per se was not appropriate for the jury's
consideration because statements should only be deemed defamatory per se as a matter of law when
it is possible to make that determination "on their face, without innuendo or explanation." Id. at 411.
This Court disagreed, adopting the Restatement's view that the trial court should "determine[]
whether a communication is capable of a defamatory meaning," but it is up to the jury to
"determine[] whether a communication, capable of a defamatory meaning, was so understood by its
recipient." Id. This Court further explained that the trial court should make the initial determination
as to "whether it is actionable, either per se or per quod, but where it is ambiguous, of doubtful
import, or susceptible of two or more interpretations, its actionability must ordinarily be decided by
the jury under appropriate instructions from the court." Id. Only after the underlying fact questions
(such as those regarding publication and "the meaning of the words conveyed to the recipient") are
decided does the question of law arise as to "whether the words are [defamatory] per se." Id. Thus,
the plaintiff in West Texas Utilities was entitled to its requested instruction and question in the jury
charge. Id. 

 Here, a jury was needed to determine the exact meaning and effect of the words
because much of the Action Alert's defamatory character arose not from its blatant statements but,
rather, from the impressions it created and inferences it encouraged. See id.; see also Musser, 723
S.W.2d at 655. Thus, the trial court erred in refusing to submit Texas Disposal's requested question
and instructions. Further, the court's failure to query the jury on defamation per se was harmful to
Texas Disposal because it, in turn, prevented Texas Disposal from having an instruction included
in the charge about presumed damages and, thereby, from potentially recovering some amount for
these damages. Accordingly, the error in the court's charge "probably caused the rendition of an
improper judgment." See Tex. R. App. P. 44.1.

 Texas Disposal's first issue is sustained, and its defamation claims regarding the
Action Alert are remanded to the trial court for a new trial consistent with this opinion. See id.
43.3(b).


Damages Award


 In its second issue, Texas Disposal contends that the jury's finding of zero damages
is contrary to the great weight and preponderance of the evidence. In light of our conclusion that the
jury should have been queried on defamation per se and presumed damages, it is necessary to also
remand the damages issue because Texas Disposal will be entitled to some amount of presumed
general damages if, on remand, the jury answers the defamation per se question affirmatively. See
Ryder Truck Rentals, Inc. v. Latham, 593 S.W.2d 334, 337 (Tex. App.--El Paso 1979, writ ref'd
n.r.e.) (defamation per se entitles plaintiff to presumed general damages for injury to character,
reputation, feelings, mental suffering or anguish, and other wrongs not susceptible to monetary
valuation); see also Peshak, 13 S.W.3d at 427 (although existence of such damage is presumed,
amount of damage remains question for jury, which may opt to award only nominal damages). 

 Although remanding for a determination on defamation per se and presumed damages
does not always require that we also remand the issues of special and exemplary damages, we
believe in this case that the damages arising from the defamation claims should be presented to the
jury collectively because, otherwise, the presentation of evidence would be unfairly hindered and
piecemeal. A litigant is entitled to a fair trial before a jury properly instructed on the issues
authorized and supported by the law governing the case. Harris County, Tex. v. Smith, 96 S.W.3d
230, 234 (Tex. 2002). If the appellate court cannot say that the jury was not affected by the
erroneous charge in arriving at the amount of damages, then the issue should be reversed and
remanded. Id. Here, had the jury been properly instructed that certain damages may be presumed
in light of finding defamation per se, the jury's consideration of all damages would likely have been
different. See Tex. R. App. P. 44.1(a)(1) (reversal warranted where error complained of probably
caused rendition of improper judgment); Wal-Mart Stores, Inc. v. Johnson, 106 S.W.3d 718, 723-24
(Tex. 2003) (while not technically incorrect, inclusion of spoilation instruction probably caused
rendition of improper judgment because it "unfairly stigmatized" party, thereby "tilting" or
"nudging" jury's view; thus, remand was necessary); see also LaGloria Oil & Gas v. Carboline Co.,
84 S.W. 3d 228, 242-43 (Tex. App.--Tyler 2001, pet. denied) (court remanded to allow same jury
to determine issues of liability and limitations under correctly worded charge). Therefore, on remand
the jury should be questioned and instructed about special and exemplary damages as well
as presumed damages.

 Texas Disposal's second issue is sustained.


Statute of Limitations


 In its third issue, Texas Disposal claims the trial court erred by granting summary
judgment on its claims arising from the 1998 Communications. Texas Disposal advances two
arguments to support its position that the claims were not barred by the statute of limitations. First,
it argues that the 1998 Communications "relate back" to its original petition because they were part
of a pattern of continuing wrongful conduct that started with the improper actions alleged in the
original petition. Second, Texas Disposal argues that, even if the claims do not relate back, the
claims are not barred by the statute of limitations because the claims arise from a continuing tort. 

 We review a trial court's grant of summary judgment de novo. McCarthy Bros. Co.
v. Continental Lloyds Ins. Co., 7 S.W.3d 727, 728 (Tex. App.--Austin 1999, no pet.). In a summary
judgment case, the issue on appeal is whether the movant met its summary judgment burden by
establishing that no genuine issue of material fact exists and that the movant is entitled to judgment
as a matter of law. Tex. R. Civ. P. 166a(c); Calvillo v. Gonzalez, 922 S.W.2d 928, 929 (Tex. 1996). 
The statute of limitations is an affirmative defense, and a defendant is entitled to summary judgment
upon presentation of sufficient evidence to conclusively establish each element of its affirmative
defense as a matter of law. Friendswood Dev. Co. v. McDade & Co., 926 S.W.2d 280, 282 (Tex.
1996); Akin v. Santa Clara Land Co., 34 S.W.3d 334, 340 (Tex. App.--San Antonio 2000, pet.
denied). The burden of proof is on the movant, and all doubts about the existence of a genuine issue
of material fact are resolved against the movant. Friendswood Dev. Co., 926 S.W.2d at 282; Great
Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41, 47 (Tex. 1965). 
Therefore, we must view the evidence and reasonable inferences drawn therefrom in the light most
favorable to the nonmovant. See Great Am. Reserve Ins. Co., 391 S.W.2d at 47.

 Texas Disposal first argues that the 1998 Communications relate back to its original
petition because they are part of a pattern of continuing wrongful conduct that commenced with the
actions that formed the basis of the original petition, not isolated acts. We disagree.

 The statute of limitations is one year for defamation claims and two years for tortious
interference with business relations. Tex. Civ. Prac. & Rem. Code Ann. §§ 16.002(a), .003. The
claims based on the 1998 Communications (which included memos sent in March and May 1998
and a press release issued on July 14, 1998) would have accrued on those respective dates of
publication. Thus, the limitations period for the defamation claims based on each communication
would have expired, respectively, in March and May 1999 and on July 14, 1999, and the limitations
period for the tortious interference claims would have expired, respectively, in March and May 2000,
and on July 14, 2000. See id. §§ 16.002(a), .003, .068. Texas Disposal did not amend its petition
until July 25, 2000, after the statute of limitations for all of the alleged actions had expired.

 Under the relation-back doctrine, an original pleading tolls the statute of limitations
for claims asserted in subsequent, amended pleadings as long as the amendments are not based on 
new, distinct, or different transactions or occurrences. Id. § 16.068. A"transaction" is defined as
a set of facts that gives rise to the cause of action premised thereon. Id.; see Hill v. Heritage Res.,
Inc., 964 S.W.2d 89, 121 (Tex. App.--El Paso 1997, pet. denied). Texas law treats each alleged
defamatory publication as a single transaction with an independent injury. See Akin, 34 S.W.3d at
340. The test is not whether the newly asserted claims are otherwise part of the same general course
or pattern of conduct as those originally pled. See Tex. Civ. Prac. & Rem. Code Ann. § 16.068;
Leonard v. Texaco, Inc., 422 S.W.2d 160, 163 (Tex. 1967); Waddill v. Phi Gamma Delta Fraternity,
114 S.W.3d 136, 144 (Tex. App.--Austin 2003, no pet.). 

 Under the relation-back test, the claims based on the 1998 Communications were
"new" because they occurred after the original petition had been filed and were "distinct or different"
because each communication was addressed to a different audience about different specific issues
and was issued months apart from the other communications. Furthermore, under Texas defamation
law, we treat each of the 1998 Communications as a separate transaction with an independent injury. 
See Akin, 34 S.W.2d at 340. Texas Disposal's contention that the acts are part of a pattern of
wrongful conduct is not the focus of an inquiry under a relation-back analysis. See Tex. Civ. Prac.
& Rem. Code Ann. § 16.068; Leonard, 422 S.W.2d at 163.

 In its second argument, Texas Disposal asserts that the claims asserted in its July 25,
2000 amended petition are not time-barred because the 1998 Communications were part of a
continuing tort that had not yet accrued. Generally, a cause of action accrues when a wrongful act
causes an injury. Upjohn Co. v. Freeman, 885 S.W.2d 538, 542 (Tex. App.--Dallas 1994, writ
denied). However, a continuing tort is an ongoing wrong causing a continuing injury that does not
accrue until the tortious act ceases. Id. at 543 (pill taken daily that caused continuing injury is basis
for continuing tort); Adler v. Beverly Hills Hosp., 594 S.W.2d 153, 156 (Tex. Civ. App.--Dallas
1980, no writ) (although each day of false imprisonment is itself separate cause of action, court
viewed involuntary detention without access to counsel in mental hospital as one continuing tort). 
A plaintiff can bring a single suit for the period of time it sustains injuries from a defendant's
conduct. Upjohn, 885 S.W.2d at 543; Adler, 594 S.W.2d at 156. The concept of a continuous tort
originated in trespass-to-land and nuisance cases and has since been expanded to include false-imprisonment cases. Upjohn, 885 S.W.2d at 542. Treating regularly occurring torts, such as false
imprisonment, as continuing torts avoids a multiplicity of suits and does not force an aggrieved
plaintiff to choose between filing successive suits or facing denial of the privilege of the full
limitation period in filing suit for each day of the false imprisonment. Id.; Adler, 594 S.W.2d at 156. 
However, if each of the defendant's separate behaviors caused a distinct injury, the continuing tort
rule does not apply. Upjohn, 885 S.W.2d at 543.

 Each of the 1998 Communications was a discrete transaction: each was addressed to
a different audience, each concerned a different issue, each was issued months apart from the other
communications, and each caused an independent injury. The 1998 Communications do not
represent a constant, continuous pattern of tortious conduct that courts have found to constitute a
continuing tort, such as each day of a false imprisonment or the daily consumption of a harmful
medication. See id.; Adler, 594 S.W.2d at 156. Furthermore, Texas Disposal has not offered any
authority, nor have we found any, that broadens the continuing tort doctrine to include actions based
on defamation, tortious interference, or tortious acts that are intermittent and irregular in nature. 
Rather, our research has revealed only contrary authority. See Dickson Constr. v. Fidelity & Deposit
Co., 960 S.W.2d 845, 851-52 (Tex. App.--Texarkana 1997, no pet.) (disparaging comment, coupled
with speaker's refusal to modify position and any harm that ensued, did not constitute continuing
tort). 

 We hold that all of Texas Disposal's claims based on the 1998 Communications are
time-barred because (1) Texas Disposal asserted them after the relevant limitations period expired,
(2) the claims do not relate back to its 1997 petition, and (3) the claims do not constitute a continuing
tort. Texas Disposal's third issue is overruled.


Privileged Communications


 In its fourth issue, Texas Disposal complains that the trial court erred in granting
summary judgment on Waste Management's ground that the March and May 1998 memos were
privileged communications. Because we hold that any defamation claim resulting from the
publication of the 1998 Communications is barred by limitations, we need not reach Texas
Disposal's issue of whether these two memos were privileged communications under the "public
interest" or "right to petition the government" exceptions to defamation. Texas Disposal's fourth
issue is overruled.


Tortious Interference


 In its fifth issue, Texas Disposal urges that the trial court erred in dismissing on
summary judgment its claims for tortious interference with an existing and/or prospective contract. 
We begin with the existing contract claim and then turn to the prospective contract claim.





 Tortious interference with an existing contract


 Texas Disposal asserts that it had a viable contract with San Antonio in May 1995
and that, due to Waste Management's interference, the execution of the San Antonio contract was
unduly delayed, causing Texas Disposal to suffer economic damages. We disagree.

 A cause of action for tortious interference with an existing contract is based on the
principle that a contract is a property right subject to protection from unwarranted interference. See
Raymond v. Yarrington, 73 S.W. 800, 803 (Tex. 1903). Although a business is not protected from
most forms of competition, it may have a superior right, by contract or otherwise, to be so protected
in certain circumstances. See Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711, 717 (Tex. 2001). 
A cause of action for tortious interference will not lie in the absence of a contract. S & A Marinas,
Inc. v. Leonard Marine Corp., 875 S.W.2d 766, 768 (Tex. App.--Austin 1994, writ denied).

 Binding and enforceable contracts are formed when an offer is made and accepted,
when there is a meeting of the minds, and when the terms are sufficiently certain to define the
parties' obligations. See Copeland v. Alsobrook, 3 S.W.3d 598, 604 (Tex. App.--San Antonio 1999,
pet. denied). The determination of a meeting of the minds, and thus offer and acceptance, is based
on the objective standard of what the parties said and how they acted, not on their subjective state
of mind. Id. If a trial court can determine conclusively that no contract existed, summary judgment
is appropriate. S & A Marinas, Inc., 875 S.W.2d at 768.

 Texas Disposal asserts that the grant of summary judgment on this issue was error
because Texas Disposal produced more than a scintilla of evidence that a contractual relationship
existed between Texas Disposal and San Antonio at the time of Waste Management's interference. 
Texas Disposal further asserts that, even absent a formal contract, Texas Disposal's and San
Antonio's relationship had matured to a point where Waste Management had a legal duty not to
interfere.

 To prove that it had a contract with the City of San Antonio, Texas Disposal relies
on ordinances passed by the city council in May 1995 and December 1996, which, respectively,
extended its disposal services contract and authorized the city manager to execute an agreement with
Texas Disposal, subject to the addition and modification of material terms. It is undisputed,
however, that a final contract between San Antonio and Texas Disposal was not executed in writing
until January 7, 1998.

 The May 1995 ordinance authorized the city manager or his representative to execute
a contract with Texas Disposal for waste disposal services for a term not to exceed thirty years and
authorized payment for the services. The ordinance did not discuss the Starcrest facility, an essential
part of the final agreement. The terms of the ordinance indicate that the city manager was authorized
to engage in negotiations to execute a contract that would be similar to the previous Texas Disposal
contract and would conform to San Antonio's waste disposal services request for proposal
guidelines. The authorization to negotiate and execute a contract is not tantamount to expressing an
intent to be bound. S & A Marinas, Inc., 875 S.W.2d at 768. Accordingly, the May 1995 ordinance
did not create a contract between Texas Disposal and San Antonio.

 In the alternative, Texas Disposal argues that a contract existed when the city council
passed its December 1996 ordinance authorizing the city manager to execute an agreement with
Texas Disposal pursuant to the "Proposed Agreement with Texas Disposal to Operate Transfer
Station" subject to the addition or modification of some material provisions. The ordinance required
the city manager to further negotiate and refine the terms of the agreement to give San Antonio the
first right of use of and access to the transfer facility, to acquire the power to limit services available
to third parties, to acquire the power to change the composition of the oversight panel, to make the
new contract independent of the old contract with Texas Disposal with respect to termination, and
to add a term that would permit San Antonio to terminate the transfer station agreement for cause
on account of a material breach. The ordinance also authorized the city council to veto any contract
term that was materially different from the contract modifications listed in the ordinance.

 The December 1996 ordinance is not evidence of a contract between San Antonio and
Texas Disposal. To the contrary, the ordinance's language requiring the addition or modification
of material terms affecting termination of the contract and San Antonio's use of the facility, as well
as the clause requiring city council approval for contract terms that significantly differ from the
requirements set forth in the ordinance, demonstrate San Antonio's continued interest in pursuing
and negotiating a waste disposal contract with Texas Disposal. To hold that the brief and cursory
language of the ordinances was sufficient to form a contract would contravene public policy allowing
governmental agencies to reconsider actions taken with respect to a contract not yet finalized. See
S & A Marinas, Inc., 875 S.W.2d at 768.

 We hold that the May 1995 and December 1996 ordinances did not demonstrate that
a contract existed between San Antonio and Texas Disposal, and thus the trial court did not err in
dismissing Texas Disposal's action for tortious interference with an existing contract. 



 Tortious interference with a prospective contract


 Although Texas Disposal was eventually awarded both the San Antonio and Austin
contracts it sought, Texas Disposal claims that it is entitled to damages for the alleged delays in
obtaining the contracts caused by Waste Management's actions under a theory of tortious
interference with prospective contractual relations. See Baty v. Protech Ins. Agency, 63 S.W.3d 841,
859 (Tex. App.--Houston [14th Dist.] 2001, pet. denied); Ash v. Hack Branch Distrib. Co., 54
S.W.3d 401, 414-15 (Tex. App.--Waco 2001, pet. denied). Texas Disposal asserts that it was error
for the trial court to dismiss this claim on summary judgment. We disagree.

 To prove a cause of action for tortious interference with prospective contractual
relations, a plaintiff must establish the following elements: (1) a reasonable probability that the
parties would have entered into a business relationship; (2) an intentional, malicious intervention or
an independently tortious or unlawful act performed by the defendant with a conscious desire to
prevent the relationship from occurring or with knowledge that the interference was certain or
substantially likely to occur as a result of its conduct; (3) a lack of priviledge or justification for the
defendant's actions; and (4) actual harm or damages suffered by the plaintiff as a result of the
defendant's interference, i.e., that the defendant's actions prevented the relationship from occurring. 
See Bradford v. Vento, 48 S.W.3d 749, 757 (Tex. 2001) (agreeing with appellate court's analysis of
issue); Baty, 63 S.W.3d at 860; Ash, 54 S.W.3d at 414-15. Conduct that is merely "sharp" or unfair
is not actionable. See Baty, 63 S.W.3d at 860; Ash, 54 S.W.3d at 414-15.

 Because Texas Disposal was awarded both contracts it sought, Texas Disposal cannot
prove its third element, that Waste Management's actions prevented the contracts from forming. 
Thus, the trial court properly dismissed the claim on summary judgment. See Tex. R. Civ. P.
166a(c); Rhone-Poulenc, 997 S.W.2d at 223.

 Implicit in Texas Disposal's claim is an invitation to expand the doctrine of tortious
interference with prospective business relationships to make actionable conduct that results in
delaying the execution of a contract, even though the formation of a contract was not prevented. 
Delays caused by competitor conduct are inherent in the course of doing business, and enlarging the
scope of tortious inference for prospective relationships to include delays would run afoul of the
policy encouraging competition in the market. See Ash, 54 S.W.3d at 414 ("Conduct that is merely
'sharp' or unfair is not actionable and cannot be the basis for an action for tortious interference with
prospective relations.") (citing Sturges, 52 S.W.3d at 726). As an intermediate appellate court, we
have no authority to alter the scope of an established cause of action. See Petco Animal Supplies,
Inc. v. Schuster, 144 S.W.3d 554, 564-65 (Tex. App.--Austin 2004, no pet.) ("intermediate appellate
court [must] follow the precedents of the Texas Supreme Court unless and until the high court
overrules them."). Because there is no supreme court authority holding that a cause of action for
tortious interference with prospective business relationships includes conduct that results only in a
delay of the execution of a contract, we must affirm the trial court's dismissal of this claim. Texas Disposal's fifth issue is overruled. 


Attempted Monopolization/Antitrust


 In its sixth issue, Texas Disposal asserts that the trial court erred by dismissing its
antitrust claim for a lack of evidence. To prevail on a claim of attempted monopolization, a plaintiff
must establish that the defendant engaged in predatory or anticompetitive conduct with a specific
intent to monopolize and had a dangerous probability of achieving monopoly power. Spectrum
Sports, Inc. v. McQuillan, 506 U.S. 477, 456 (1993); see also Tex. Bus. & Com. Code Ann.
§ 15.05(b). Here, on summary judgment, the trial court ruled that Waste Management's conduct,
allegedly performed in an attempt to monopolize, did not, as a matter of law, (1) constitute predatory
or anticompetitive conduct or (2) create a dangerous probability of Waste Management achieving
monopoly power over the San Antonio or Austin markets. (19) To demonstrate that the court's grant
of summary judgment against its antitrust claim was in error, Texas Disposal must demonstrate that
there is evidence in the record to raise a genuine issue of material fact on both of these essential
elements; if the record is void of evidence to support any single essential element, we must affirm
the dismissal. See Tex. R. Civ. P. 166a.

 Generally, Texas Disposal claims that Waste Management engaged in anticompetitive
behavior by lobbying and negotiating with government officials from Austin and San Antonio in a
manner that would advance Waste Management's business and harm Texas Disposal's and that was
defamatory of Texas Disposal. Next, Texas Disposal asserts that, while these alleged
anticompetitive activities were taking place, Waste Management controlled over 48% of the San
Antonio landfill market and 35% of the Austin landfill market, meaning that there was a high
probability of success for Waste Management to obtain a monopoly of the landfill
market in these cities.

 We begin our review by considering whether there is evidence in the record to
demonstrate that Waste Management's efforts to prevent Texas Disposal from obtaining the San
Antonio and Austin contracts created a dangerous probability of monopoly. To withstand summary
judgment on the element of "dangerous probability of monopoly," a plaintiff must adduce proof that
the defendant's conduct "threatens actual monopolization." Spectrum Sports, 506 U.S. at 456. In
determining if there is an actual danger of monopoly, we must "consider the relevant product and
geographic market and the defendant's economic power in that market." Id. at 459. Courts have
required evidence clearly defining the relevant market in order for a plaintiff to prevail on this
element. For example, in Surgical Care Center v. Hospital Service District No. 1, the plaintiff's
evidence was insufficient because the expert defined the "geographic area" simply by relying on the
service area without identifying what other hospitals or clinics may have been competitors within
that area. 309 F.3d 836, 840 (5th Cir. 2002). Also, the time to analyze whether there is a dangerous
probability of monopolization is when the acts occur, not in hindsight. Multiflex, Inc. v. Samuel
Moore & Co., 709 F.2d 980, 991 (5th Cir. 1983). Just because the defendant does not ultimately
achieve a monopoly does not mean there was not a dangerous probability that the
defendant would succeed. Id. 

 Because the purpose of the statute is to protect the public's interest in a competitive
market, the test is directed "not against conduct which is competitive, even severely so, but against
conduct which unfairly tends to destroy competition itself." Spectrum Sports, 506 U.S. at 458. The
Supreme Court noted that it "may be difficult to distinguish robust competition from conduct with
long-term anticompetitive effects" but cautioned courts to "avoid constructions . . . which might chill
competition, rather than foster it." Id. at 458-59. 

 Texas Disposal has failed to provide evidence concerning the relevant market and
Waste Management's ability to lessen competition within that market. Although the geographic area
centers on Austin and San Antonio, the record reflects that both parties also transport waste from
various surrounding communities. Texas Disposal fails, however, to explain what the market
availability for their services was in these areas at the time of Waste Management's actions and,
much less, what other waste disposal competitors existed in the relevant market and, if there were
any other competitors, what percentage of the market they controlled. A review of Texas Disposal's
various summary judgment pleadings and appellate briefs reveals the same broad argument each time
without any supporting evidence. 

 Specifically, Texas Disposal consistently asserts that Waste Management controlled
48% of the landfill market in San Antonio and 35% in Austin. But, Texas Disposal never cites or
attaches any evidence that supports this claim. Moreover, even assuming it is true that Waste
Management controlled approximately 40% of the market, this is not evidence of a dangerous
probability of monopoly without evidence to define the market, as discussed above. Finally, the fact
that Waste Management controlled less than half of the relevant market does not, standing alone,
create a genuine issue of material fact about whether Waste Management had a dangerous probability
of achieving monopoly power. This situation is easily contrasted with the supreme court's recent
review of cases in which the defendants' control of 75%-100% of the market was considered
material. See Coca-Cola Co. v. Harmar Bottling Co., 50 Tex. Sup. J. 21, 2006 Tex. LEXIS 1038,
at *48 & n.62 (Tex. Oct. 20, 2006) (citing Eastman Kodak Co. v. Image Technical Servs., Inc., 504
U.S. 451, 481 (1992); United States v. Grinnell Corp., 384 U.S. 563, 571 (1966)); see also Surgical
Care Ctr., 309 F.3d at 840 n.5 (noting that evidence was insufficient where defendant's control of
42%-44% share of market "was not dominant"). 

 Based on Texas Disposal's failure to provide evidence that Waste Management's
actions created a "dangerous probability of monopoly," which is an essential element of Texas
Disposal's attempted monopolization claim, the trial court did not err in granting Waste
Management's summary judgment on this claim. See Tex. Bus. & Com. Code Ann. § 15.05(b); Tex.
R. Civ. P. 166.

 Texas Disposal's sixth issue is overruled. 


CONCLUSION


 Regarding Texas Disposal's defamation claims arising from the Action Alert memo,
we hold that the jury's finding of actual malice is supported by clear and convincing evidence and
that the trial court erred in refusing to question and instruct the jury on the issues of defamation per
se and presumed damages. Therefore, we overrule Waste Management's cross point and sustain
Texas Disposal's first and second issues. This requires that we reverse and remand the court's take-nothing judgment for a new trial on Texas Disposal's defamation claims arising from the Action
Alert memo consistent with this opinion.

 Regarding Texas Disposal's claims arising from the 1998 Communications, we hold
that the trial court correctly concluded that they are barred by the statute of limitations and, therefore,
do not decide whether they were privileged communications. Accordingly, we overrule Texas
Disposal's third and fourth issues. Regarding Texas Disposal's claims for tortious interference and
attempted monopolization, we hold that the trial court correctly granted summary judgment as to
both claims because Texas Disposal failed to put forth evidence of at least one essential element of
each claim. As a result, we overrule Texas Disposal's fifth and sixth issues. Based on these rulings,
the judgment is affirmed in all other respects. 


 

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed in part, Reversed and Remanded in part on Motion for Rehearing

Filed: December 29, 2006
1. We will refer collectively to appellees Waste Management of Texas, Inc. and Waste
Management Holdings, Inc. (f/k/a Waste Management, Inc.) as "Waste Management."
2. Waste Management disputes that it gave final approval. Martin initially testified that Loren
Alexander of Waste Management reviewed and approved the memo. Two years later, Martin
testified that, upon reading Alexander's deposition denying that he approved it, Martin was changing
his testimony to agree that Alexander did not give final approval for the memo.
3. Martin was originally named as a defendant, but the claims against him were voluntarily
dismissed.
4. Texas Disposal ultimately finalized its contract with San Antonio in January 1998 and with
Austin in May 2000 (following a temporary contract that had been entered into with Austin in
February 1999).
5. The motion also sought to dismiss claims based on Waste Management's hiring of Texas
Disposal's former employees, which had been added in Texas Disposal's July 2000 amended
petition, as being barred by res judicata because they were subject to a final judgment in a separate
suit in Bexar County. These claims were ultimately dismissed and are not a part of this appeal.
6. Subsequently, the court reconsidered this ruling, prompting Waste Management to file a
renewed motion for partial summary judgment on the issue, to which Texas Disposal filed a
response. In its March 25, 2003 summary judgment order, the court again resolved the issue in favor
of Waste Management.
7. The record reflects that leachate is "any liquid that comes in contact with garbage." The
liquid may result from nature or may be generated by the waste in the landfill. Because this liquid
is polluted, state and federal regulations (such as "Subtitle D" of the EPA rules) require that landfills
have a method of collecting, extracting, and disposing of it. By implying that Texas Disposal's
landfill had no leachate collection system, the memo implied that the landfill failed to comply with
Subtitle D.
8. Although the summary judgment order also found fact issues remaining on the business
disparagement claim, thereby preserving the claim for trial, it is not relevant here because the claim
was dismissed on directed verdict, and Texas Disposal did not raise the dismissal of this claim as
an issue on appeal.
9. Also, at the close of the evidence Texas Disposal requested a partial directed verdict on the
issue of defamation per se, which the trial court denied.
10. As an initial matter, Texas Disposal claims that this Court lacks jurisdiction over Waste
Management's cross point because Waste Management did not file a separate notice of appeal on
the issue of affirming the take-nothing judgment based on a lack of evidence about actual malice. 
See Tex. R. App. P. 25.1(c). According to Texas Disposal, a separate notice of appeal is necessary
because Waste Management seeks greater relief by this cross point than was granted by the trial
court. We disagree and address the merits of Waste Management's cross point. See Helton v.
Railroad Comm'n, 126 S.W.3d 111, 119 (Tex. App.--Houston [1st Dist.] 2003, pet. denied)
(distinguishing (1) cross points requiring separate notice of appeal because they seek to alter
judgment by seeking more relief than was granted in judgment from (2) cross points that do not
require separate notice of appeal because they present merely an alternative basis for affirming
judgment); First Gen. Realty Corp. v. Maryland Cas. Co., 981 S.W.2d 495, 503 (Tex. App.--Austin
1998, pet. denied) (no separate notice of appeal is needed for appellees to present alternative grounds
for affirming take-nothing judgment).
11. Texas Disposal does not contend that the trial court erred in ruling that it is a limited
purpose public figure.
12. Martin was the consultant hired by Waste Management to prepare the memo. Erwin was
one of Martin's primary sources of information relating to the landfill liner and leachate collection
system issues discussed in the Action Alert memo.
13. The jury was further instructed on the meaning of clear and convincing evidence.
14. The trial court also ruled, however, that the statement about increased traffic on IH-35 was
not actionable because it was "opinion, rhetoric, or hyperbole." 
15. The trial court ruled as such in its March 2003 summary judgment order, and Waste
Management does not challenge that ruling on appeal. See supra footnote 7 and accompanying text.
16. Martin also provided inconsistent testimony about the review and approval of the memo
that he obtained from Waste Management personnel. He initially testified in his deposition, which
was read aloud to the jury, that people from Waste Management (specifically, Loren Alexander) had
reviewed and given final approval to the memo before he submitted it for a "fax blast" to the Austin
"environmental community." Then, in live testimony, Martin announced that, because he had since
read Alexander's deposition in which he denied approving the memo, Martin was changing his
testimony to say that Alexander had not approved the memo. While this is not direct proof that
Martin knew of the falsity or seriously doubted the truth about the statements in the Action Alert,
it does provide circumstantial evidence about his overall credibility as a witness. From Martin's
equivocating about who was ultimately responsible for the statements in the memo, the jury could
infer that Martin was willing to alter his testimony to protect himself and/or his long-time associates
at Waste Management.
17. Waste Management contends that the issue briefed by Texas Disposal preserved error only
on the lack of a defamation per se question, but not the accompanying instruction. We reject this
hyper-technical interpretation. It is clear from Texas Disposal's complaint about the court's failure
to "query" the jury that Texas Disposal is collectively complaining about the court's refusal to
submit the relevant questions and instructions regarding defamation per se and presumed damages. 
For instance, one of the subheadings of Texas Disposal's first issue states, globally, that "TDSL was
entitled to a jury charge consistent with the law of defamation per se" and thereafter discusses error
regarding both the question and instructions. Texas Disposal has effectively presented this issue for
our review. See Tex. R. App. P. 38.1(e) ("statement of an issue will be treated as covering every
subsidiary issue that is fairly included").
18. Waste Management asserts in its response to the motion for rehearing that Texas Disposal
failed to present an argument on appeal that fact issues remained regarding defamation per se. We
disagree. In its reply brief, Texas Disposal's first argument claims "A fact issue was raised as to
defamation per se, and thus the issue should have been submitted to the jury." See Tex. R. App. P.
38.1(e).
19. Specifically, the court ruled that, pursuant to Waste Management's traditional summary
judgment grounds, it had conclusively negated these two essential elements of Texas Disposal's
attempted monopolization claim and that, pursuant to its no-evidence ground, Texas Disposal had
failed to produce a scintilla of evidence to support the dangerous probability element. See Tex. R.
Civ. P. 166a(c), (i); Wal-Mart Stores, Inc. v. Rodriguez, 92 S.W.3d 502, 506 (Tex. 2002) (no
evidence standard); Elliott-Williams Co. v. Diaz, 9 S.W.3d 801, 803 (Tex. 1999) (traditional
standard). The court denied Waste Management's motion as to the "intent to monopolize" element,
finding that there was evidence in support of it. Thus, Texas Disposal's challenge on appeal is
limited to the other two elements--predatory or anticompetitive conduct and a dangerous probability
of achieving a monopoly.